**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SOPHIA SAHAGÚN, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>THEMIS BAR REVIEW, LLC,<br><br>     Defendant. | Case No. 24-cv-2065<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Sophia Sahagún ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to himself and her counsel, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.  This is a class action suit brought on behalf of all persons with Facebook accounts who have purchased test preparation services from themisbar.com, a website owned and operated by Themis Bar Review, LLC ("Defendant" or "Defendant").

2.  Plaintiff brings this action in response to Defendant's practice of knowingly disclosing its users' personally identifiable information ("PII") and video viewing activity to Facebook without their consent.

3.  Specifically, themisbar.com uses code called the Facebook Tracking Pixel to track what videos its users watch, and to then send that data to Facebook along with their PII, including their name and email address.

4.     The sharing of that data without consent of Plaintiff or other consumers constitutes a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* ("VPPA") and the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq.* ("CIPA")

**PARTIES**

5.     Plaintiff Sophia Sahagún is, and has been at all relevant times, a resident of Los Angeles, California and has an intent to remain there, and is therefore a domiciliary of California.  Plaintiff created a Facebook account in approximately 2016.  In or about September 27, 2022, Plaintiff enrolled for a bar preparation course on themisbar.com.  Thereafter, in preparation for the March 2023 Multistate Professional Responsibility Examination and the July 2023 California Bar Examination, Plaintiff watched numerous lecture videos on themisbar.com. Unbeknownst to Plaintiff, and without her consent, Defendant was sharing Plaintiff's video watching activity and her PII with Facebook through its use of the Facebook Tracking Pixel. Indeed, Plaintiff's Offsite Activity Report on facebook.com shows that Defendant disclosed such data to Facebook on 400 occasions:



6.     Defendant Themis Bar Review, LLC is a Delaware limited liability company with its principal place of business at 320 W. Ohio St. Suite 4W, Chicago, IL 60654.  On information and belief, none of Defendant's members are citizens of California.  Defendant owns and operates themisbar.com, which is used throughout Illinois and the United States.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States.

8.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Chicago, Illinois.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### I.     The VPPA

10.     The genesis of the VPPA was President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed Bork's rental history to the Washington City Paper, which then published it.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

11.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

12.     The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

13.     A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.     CIPA

14.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

15.     The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added)

16.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an*

4

> *unannounced second auditor, whether that auditor be a person or*
> *mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the
> speaker an important aspect of privacy of communication—the
> right to control the nature and extent of the firsthand dissemination
> of his statements.

*Id.*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

17.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any

person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection …

with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the

communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any .

. . communication while the same is in transit or passing over any wire, line, or cable, or is being

sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . .

. any information so obtained."

18.     CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or

conspire[] with any person" who conducts the aforementioned wiretapping, or those who

"permit" the wiretapping.

19.     In addition, CIPA § 632(a) prohibits any person or entity from "intentionally and

without the consent of all parties to a confidential communication, us[ing] an electronic

amplifying or recording device to eavesdrop upon or record [a] confidential communication."

20.     A "confidential communication" for the purposes of CIPA § 632 is "any

communication carried on in circumstances as may reasonably indicate that any party to the

communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

III.    **Facebook and the Facebook Tracking Pixel**

21.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.  Facebook describes itself as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

22.    Facebook generates revenue by selling advertising space on its website.

23.    Facebook sells advertising space by highlighting its ability to target users.[3] Facebook can target users so effectively because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[4]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[5]

24.    Advertisers can also build "Custom Audiences."[6]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."  Advertisers can

---

[1] *Sam Schechner and Jeff Horwitz, How Many Users Does Facebook Have? The Company Struggles to Figure It Out,* WALL. ST. J. (Oct. 21, 2021).
[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY,
https://www.facebook.com/communitystandards/integrity_authenticity.
[3] FACEBOOK,WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.
[4] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[5] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[6] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=24690979533764
94.

use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[7]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.  One such Business Tool is the Facebook Tracking Pixel.

26.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[8]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

26.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.  An advertiser can also create their own tracking parameters by building a "custom event."

27.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-

---

[7] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=40166839044232
8.
[8] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

specific Data."[9]  HTTP Headers collect "IP addresses, information about the web browser, page

location, document, referrer and persons using the website."[10]  Pixel-specific Data includes "the

Pixel ID and cookie."[11]

## IV.  Themis and the Facebook Tracking Pixel

28.     Defendant describes its online bar exam preparation service as providing "[o]n-

demand video lectures taught by world class professors."[12]  Defendant provides users with video

lectures on every bar exam topic "in concise, 20-minute chapters."[13]  To access this content,

users must enroll with Themis and pay a fee of up to $2,995.

29.     Themis's website hosts the Facebook Tracking Pixel and transmits PageView data

to Facebook, which includes the Uniform Resource Locators ("URL") dedicated solely to

Themis video lectures.

30.     This event data permits an ordinary person to identify what video an individual

has watched.

31.     In addition, themisbar.com contains the code for at least eight different Facebook

cookies:

| Name | Value | Domain ▲ |
|------|-------|----------|
| wd | 1313x596 | .facebook.com |
| fr | 1ICxxOX7PXOeDzQnF.AWX_o8Rya6tp4QRWEIOjCpokn... | .facebook.com |
| xs | 41%3AaXM3cfwWly5yhA%3A2%3A1704827431%3A-1... | .facebook.com |
| dpr | 1.662500023841858 | .facebook.com |
| ps_n | 0 | .facebook.com |
| c_user | 679395441 | .facebook.com |
| sb | jVa6YaHou2Nev98LSBnWYOo7 | .facebook.com |
| datr | D8aAZZE7dAvjNYkeGxtPdRL6 | .facebook.com |

---

[9]  FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebookpixel/.
[10] *Id.*
[11] *Id.*
[12] https://www.themisbar.com/pass-the-bar-exam
[13] https://www.themisbar.com/faq

32.     When someone who is logged into Facebook watches a video on Themis, the Pixel transmits PII from these Facebook cookies to Facebook along with their PageView data. For instance, the c_user cookie contains a visitor's Facebook ID.

33.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of facebook.com.

34.     The combination of the PageView data and the PII from Facebook's cookies embedded on themisbar.com permits Facebook to see who watched what video.

## CLASS ALLEGATIONS

35.     **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States with a Facebook account who watched a video on themisbar.com (the "Class").  Plaintiff also seeks to represent a subclass of similarly situated individuals defined as all persons in California with a Facebook account who watched a video on themisbar.com (the "Subclass").  Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate.

36.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class and Subclass is believed to be so numerous that joinder of all members is impractical.

37.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case.

Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

> (a) whether Defendant collected Plaintiff's and the Class's PII and video viewing activity;

> (b) whether Defendant unlawfully disclosed and continues to disclose its users' PII and video viewing activity in violation of the VPPA;

> (c) whether Defendant's disclosures were committed knowingly; and

> (d) whether Defendant disclosed Plaintiff's and the Class's PII and video viewing activity without consent.

38.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class and Subclass because Plaintiff, like all members of the Class and Subclass, used Defendant's website to watch videos, and had her PII and video viewing activity collected and disclosed by Defendant.

39.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and CIPA.  Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class and Subclass.  Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class or Subclass.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclass, additional claims as may be appropriate, or to amend the definition of the Class and Subclass to address any steps that Defendant took.

40. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclass is impracticable. Even if every member of the Class and Subclass could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class and Subclass. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710

41. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

42. Defendant is a "video tape service provider" because it has created, hosted, and delivered hundreds of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

43.     Plaintiff and members of the Class are "consumers" because they enrolled in test preparation courses on Defendant's website.  18 U.S.C. § 2710(a)(1).  This makes them a "subscriber" and therefore a "consumer" under the VPPA.

44.     Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information.  Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's event data, including information about the videos she viewed.

45.     Plaintiff and the Class members viewed video clips using Defendant's website.

46.     Defendant knowingly disclosed Plaintiff's PII and video viewing activity because it used that data to build audiences on Facebook and retarget them for their advertising campaigns.

47.     Plaintiff and class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII or video viewing activity to third parties.

48.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

## COUNT II
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631(a)

49.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

50.     Plaintiff brings this claim against Defendant individually and on behalf of the

Subclass.

51.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of

conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability

under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any

machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether
> physically, electrically, acoustically, inductively or otherwise, with
> any telegraph or telephone wire, line, cable, or instrument,
> including the wire, line, cable, or instrument of any internal
> telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the
> communication, or in any unauthorized manner, reads or attempts
> to read or learn the contents or meaning of any message, report, or
> communication while the same is in transit or passing over any
> wire, line or cable or is being sent from or received at any place
> within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to
> communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or
> persons to unlawfully do, or permit, or cause to be done any of the
> acts or things mentioned above in this section.

52.     CIPA § 631(a) is not limited to phone lines, but also applies to "new

technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL

8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be

construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v.*

*Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

53.     Facebook's Business Tools, including but not limited to the Facebook Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

54.     Facebook is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Facebook had the capability to use the wiretapped information for its own purposes. Accordingly, Facebook was a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

55.     At all relevant times, by its Business Tools, Facebook willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

56.     At all relevant times, Facebook used or attempted to use the communications intercepted by its Business Tools to promote and improve its advertising platform.

57.     At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Facebook to wiretap Plaintiff and Class Members using the Business Tools and to accomplish the wrongful conduct at issue here.

58.     Plaintiff and Subclass Members did not provide their prior consent to Facebook's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's

and Subclass Members' electronic communications. Nor did Plaintiff and Subclass Members

provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or

otherwise enabling Facebook's conduct.

59.     The wiretapping of Plaintiff and Subclass Members occurred in California, where

Plaintiff and Subclass Members accessed the Website and where Facebook—as enabled by

Defendant—routed Plaintiff's and Subclass Members' electronic communications its servers.

60.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been

injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000

for each of Defendant's violations of CIPA § 631(a).

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

61.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

62.     Plaintiff brings this claim against Defendant individually and on behalf of the

Subclass.

63.     CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential
> communication, uses an electronic amplifying or recording device
> to eavesdrop upon or record the confidential communication,
> whether the communication is carried on among the parties in the
> presence of one another or by means of a telegraph, telephone, or
> other device, except a radio.

64.     Facebook's Business Tools, including but not limited to the Facebook Pixel, are

"electronic amplifying or recording device[s]."

65.     At all relevant times, Facebook intentionally used its Business Tools to eavesdrop

upon and record the confidential communications of Plaintiff and Subclass Members, on the one

hand, and Defendant, on the other.

15

66.     When communicating with Defendant, Plaintiff and Subclass Members had an objectively reasonable expectation of privacy, based on the VPPA.  Thus, Plaintiff and Subclass Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Facebook, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

67.     Plaintiff and Subclass Members did not consent to any of Facebook's actions. Nor have Plaintiff or Class Members consented to Facebook's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiff and the Class and Subclass their reasonable

attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so

triable.

Dated: March 12, 2024

**SOPHIA SAHAGÚN**, individually and on behalf of all others similarly situated,

s/ J. Dominick Larry

J. Dominick Larry
**NICK LARRY LAW LLC**
1720 W. Division St.
Chicago, IL 60622
773.694.4669
nick@nicklarry.law

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta
Alec M. Leslie*
1330 Avenue of Americas, 32nd Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
          pfraietta@bursor.com
          aleslie@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*